FILED

2017 APR -6 AM 8: 38

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SCOTT FISHER and NORTH FLORIDA
QUALITY GOODS AND SERVICES, LLC,
D/B/A GONE BROKE GAMING,

Plaintiffs,

v. Civil Action No. 3:17-cv-393-J-39JBT

TOWN OF ORANGE PARK,

Defendant.

---

# VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiffs Scott Fisher and his business, North Florida Quality Goods and Services LLC, d/b/a "Gone Broke Gaming," ("Plaintiffs") bring this civil rights lawsuit against the Defendant Town of Orange Park ("the Town").

## INTRODUCTION

This lawsuit seeks to vindicate the free-speech rights of a family-owned video game store, called Gone Broke Gaming, in Orange Park, Florida. The Town is using its unconstitutional sign code to stop Gone Broke Gaming from displaying an inflatable Mario—the classic video game character—in front of its store.

Gone Broke Gaming had displayed a nine-foot inflatable Mario on its own private property last summer, with great success. Not only did the inflatable help customers find the

store, but Mario quickly became a local attraction. The Town of Orange Park, however, demanded that Mario come down. According to the Town, the display is an illegal "portable sign" under its sign code and subject to fines of $100 a day. Gone Broke Gaming had no choice but to remove Mario. As a result, the community is deprived of this fun display and the store is suffering a significant decrease in customers.

The Town does not ban all portable signs, however. In fact, dozens of large inflatables have been legally displayed throughout the Town in just the last year alone. That is because the Town allows portable signs, including inflatables, if they fall into one of three categories: a holiday decoration, a seasonal decoration, or a "creative idea" that lacks a "commercial message." Under the last category, a business could display the same exact inflatable Mario that Gone Broke Gaming was displaying, so long as that business was not selling Mario-related products.

Allowing some speech but not others based on what it says and who is speaking is "content based" and "speaker based" discrimination under the First Amendment. Both are presumptively unconstitutional and Orange Park cannot justify this discrimination. Thus, the Town's laws, policies, and actions violate Plaintiffs' free-speech rights.

Plaintiffs thus respectfully request that this Court declare that the Town's general ban on portable signs is unconstitutional, both as applied to Plaintiffs' inflatable Mario and on its face. Plaintiffs similarly request that this Court enjoin the Town from enforcing its portable sign ban against Plaintiffs' inflatable Mario and all other portable signs.

## JURISDICTION

1. Plaintiffs bring this civil rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgments Act, 28 U.S.C. § 2201. Plaintiffs seek a declaration that the challenged portions of the Town's sign code, both as applied and facially, violate the First Amendment. Plaintiffs also seek injunctive relief against the enforcement of the challenged portions of the sign code, both as applied and facially.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

## VENUE

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4. Plaintiff Scott Fisher is a United States citizen and resident of Clay County, Florida. He owns the company North Florida Quality Goods and Services LLC with his wife, Lori Fisher.

5. Plaintiff North Florida Quality Goods and Services LLC is a limited liability company that has been registered in the State of Florida since 2012.

6. North Florida Quality Goods and Services LLC operates a video game store, called Gone Broke Gaming, located in the Town of Orange Park, Clay County, Florida. Scott runs Gone Broke Gaming, which sells both vintage and modern video games and video game systems.

7. Defendant Town of Orange Park is a municipal corporation located in Clay County, Florida.

## STATEMENT OF FACTS

**Scott Opens Gone Broke Gaming**

8. Scott Fisher is a 33-year-old entrepreneur who has bought, sold, and traded video games and game systems for about five years. Scott sells classic, vintage, and rare games and game systems. He also sells new games and game systems.

9. Although Scott has customers from all over the world, almost all of his customers for new products are local.

10. Scott's company does business under the name, "Gone Broke Gaming."

11. Gone Broke Gaming is the sole means that Scott uses to support his wife and two children.

12. At first, Scott did business online and at a flea market.

13. Encouraged by his success, Scott moved Gone Broke Gaming to a dedicated storefront in May 2015. The storefront is on Kingsley Avenue, a four-lane road in Orange Park, Florida—a small suburb of Jacksonville.

14. Scott runs the store while his wife, Lori, waitresses full time and attends college. Together, they take care of their children.

15. At first, there were few walk-in customers at Gone Broke Gaming, despite Scott's attempt to get the word out about its location. In fact, people remarked to Scott that they didn't know that the store was there. Others said that they had difficulty finding it.

16. The store is in a small brick building with small windows, and it is set back from the road by approximately 44 feet. The store is lost in the long strip of shops, convenience stores, and gas stations on busy Kingsley Avenue.

17. A true and accurate representation of Gone Broke Gaming's storefront, as seen from Kingsley Avenue, is attached as Exhibit 1.

18. Even when people set out to look for the store, they can easily miss it.

19. Making matters worse, the small storefront has little space to hang signage. In any event, such signage would be difficult to see from the sidewalk or the road.

20. So, Scott acted to increase Gone Broke Gaming's visibility.

**Plaintiffs Display the Inflatable Mario**

21. In July 2016, after getting permission from his landlord and neighbors, Scott began to display a nine-foot inflatable on his property directly in front of the store. The inflatable depicted Mario, the classic video game character.

22. A true and accurate representation of the inflatable Mario being displayed in front of Gone Broke Gaming is attached as Exhibit 2.

23. Scott always displayed Mario during business hours and always brought it inside for the night. The inflatable is made of oxford cloth and, when it was displayed, it was always safety secured to the storefront.

24. Mario's effect was immediate. Gone Broke Gaming experienced a visible increase in foot traffic and even became a local attraction.

25. People who came in often commented to Scott that they never knew the store was there until they saw Mario. Others said that Mario made it much easier to find Gone Broke Gaming's small storefront on the otherwise busy road.

26. People also stopped to take photos with Mario and passing children would wave at Mario.

27. Despite the public's enjoyment of Mario, however, his days were numbered.

**Mario Is Cited Under the Town's Sign Code as an Illegal "Portable" Sign.**

28. Scott received a notice of code violation for Mario from the Town on July 29, 2016. The notice was given by Orange Park Code Enforcement Officer Gary Cooper.

29. The notice stated that the inflatable Mario was an illegal "[p]ortable sign[]" under the Town's sign code.

30. The notice threatened fines of "$250 per offense, per day and not to exceed $500 per offense, per day in the case of a repeat violation" if Gone Broke Gaming continued to display Mario.

31. For the purpose of this lawsuit, Scott obtained a copy of this notice of violation from the Town on March 21, 2017. This copy contains handwritten notes that appear to be from Mr. Cooper. A true and accurate copy of the notice of violation Scott obtained is attached as Exhibit 3.

32. After Gone Broke Gaming received the notice of violation, dozens of supporters of Mario expressed outrage against the Town on social media. One loyal supporter and long-time customer, Brian Long, even marched outside of Town Hall holding two protest signs. The story was also covered in the local newspaper, Clay Today.

33. Like his supporters, Scott felt angry about the notice of violation. But he was also perplexed. Scott had seen other inflatables displayed in the Town. So Scott looked up the Town's sign code.

**The Town's Sign Code**

34. Despite Orange Park's small size, the Town's sign code is very long and restrictive.

35. A true and accurate copy of Orange Park's sign code is attached as Exhibit 4. This copy was retrieved from the Town's website, Orange Park, Fla., Code of Ordinances, Land Development Regulations, art. VII (2016), available at https://www.municode.com /library/fl/orange_park/codes/code_of_ordinances?nodeId=PTIIILADERE_ARTVIISIRE.

36. Orange Park's sign code has a broad definition of "sign." "Sign" is defined as "any device, fixture, placard or structure which uses color, form, graphics, illumination, architectural style or design with text, or writing to advertise, attract attention, announce the purpose of, or identify the purpose of any person or entity or to communicate information of any kind to the public." Orange Park, Fla., Code of Ordinances, Land Development Regulations, art. VII (2016) [hereinafter sign code] § 7.03.00 (definition section).

37. Under this definition, the inflatable Mario is a sign.

38. The sign code generally requires a sign permit and fee before a sign may be displayed. Sign code § 7.12.00(a), (c) (sign permit); *id.* § 7.14.00 (fees).

39. The sign code, however, prohibits some signs, and a permit cannot be obtained for them.

40. One type of prohibited sign is a "[p]ortable sign[]." Sign Code § 7.05.00(f).

41. Under the Town's sign code, a "portable sign" is "any sign, banner, or poster that is not permanently attached to the ground or structure," including "a cold air inflatable sign." Sign code § 7.03.00 (definition section).

42. Cold-air inflatables use a small machine to blow air inside the inflatable in order to keep the inflatable standing tall.

43. Plaintiffs' inflatable Mario is a cold-air inflatable sign.

44. The Town's sign code prohibits portable signs, including cold-air inflatables, in every zoning district, including in the General Commercial district in which Gone Broke Gaming is located.

**Orange Park's Ban on Portable Signs, Including Inflatables, Has Exemptions**

45. Not all portable signs are banned under the Town's sign code, however. The sign code allows several types of portable signs to be displayed outdoors, including cold-air inflatables.

46. These exemptions to the ban on portable signs can be found in sign code section 7.27.00.

47. Sign code section 7.27.00 provides that certain signs shall be allowed "in every zoning district." These signs can be displayed without obtaining a sign permit or paying a fee. *Id.*

48. Two of the sign categories allowed under section 7.27.00 are "[t]emporary holiday and seasonal decorations" and "artwork." Sign code § 7.27.00(q), (g).

49. Under sign code sections 7.27.00(q) and 7.27.00(g), businesses and individuals may display inflatables that the Town considers to be holiday decorations, seasonal decorations, or artwork.

50. These inflatables can be displayed outdoors without a sign permit or otherwise seeking permission from the Town.

***The Holiday and Seasonal Decoration Exemption***

51. The Town's sign code defines "[h]oliday and seasonal decorations" as "decorations that pertain to legal or other recognized holidays or to a season of the year." Sign code § 7.03.00 (definition section).

52. Under the holiday and seasonal decoration exemption, any business or individual can display an inflatable sign outdoors if the Town considers that sign's subject matter to relate to a holiday or season. Sign code § 7.27.00(q) (allowing "holiday and seasonal decorations"); *id.* § 7.03.00 (defining "[h]oliday and seasonal decorations").

53. Dozens of large inflatables have been displayed outdoors in the Town under the holiday and seasonal decoration exemption in just the last year alone.

54. There were over ten holiday inflatables displayed on the front lawn of the home at 2102 Hopkins Street, Orange Park during December 2016. These inflatables included a dragon and a rat that were both wearing a Santa hat, as well as Mickey and Minnie Mouse wearing holiday garb.

55. A true and accurate photograph of this display, taken by Scott, is attached as Exhibit 5.

56. There was also an inflatable nativity scene displayed on the front lawn of the home at 2135 Hickory Lane, Orange Park during December 2016.

57. A true and accurate photograph of this display, taken by Scott, is attached as Exhibit 6.

58. There were also over 20 holiday inflatables displayed at the home of 3365 Doctors Lake Drive, Orange Park during December 2016. These inflatables included multiple Disney characters and other cartoon characters wearing Santa hats and other seasonal garb.

59. A true and accurate photograph of this display, taken by Scott, is attached as Exhibit 7.

60. Likewise, under section 7.27.00(q), any individual or business, including Plaintiffs, could erect an outdoor display of an inflatable Santa at Christmastime because it pertains to a "holiday."

61. An inflatable Mario wearing a Santa hat also pertains to a "holiday[]" under section 7.03.00 of the Town's sign code. *See* sign code § 7.03.00 (defining "[h]oliday and seasonal decorations" as "decorations that pertain to legal or other recognized holidays").

62. Thus, under section 7.27.00(q), any individual or business, including Plaintiffs, can erect an outdoor display of an inflatable Mario with a Santa hat at Christmastime.

63. An inflatable dragon wearing sunglasses and holding a surf board would also pertain to the "season" of summer. *See* sign code § 7.03.00 (defining "seasonal decorations" as "decorations that pertain . . . to a season of the year").

64. Thus, under section 7.27.00(q), any individual or business, including Plaintiffs, could erect an outdoor display with an inflatable dragon wearing sunglasses and holding a surf board during the season of summer.

65. An inflatable Mario wearing sunglasses and holding a surf board would also pertain to the season of summer.

66. Thus, under section 7.27.00(q), any individual or business, including Plaintiffs, could erect an outdoor display of an inflatable Mario wearing sunglasses and holding a surf board during the summertime.

67. The only reason that Plaintiffs cannot display the inflatable Mario in front of Gone Broke Gaming pursuant to section 7.27.00(q) is because Mario is not wearing or holding any holiday or seasonal items, and the Town thus does not believe Mario qualifies as a holiday or seasonal decoration due to its subject matter.

68. Plaintiffs want to be able to display Mario as is and do not want to have to decorate him with holiday or seasonal items.

***The Artwork Exemption***

69. In addition to allowing the display of holiday and seasonal decorations in all zoning districts pursuant to section 7.27.00(q), the sign code also allows all zoning districts to display "artwork." This artwork provision is found at sign code section 7.27.00(g).

70. As with section 7.27.00(q), section 7.27.00(g) operates as an exemption to the sign code's ban on portable signs, including inflatable signs.

71. The sign code defines "[a]rtwork" very broadly. It is defined as "a two-or three-dimensional representation of a creative idea that is expressed in a form and manner as

to provide aesthetic enjoyment for the viewer rather than to specifically convey the name of the business or a commercial message about the products or services offered on the property upon which the artwork is displayed." Sign code § 7.03.00 (definition section).

72. The sign code defines a "commercial message" as "any sign wording, logo, or other representation or image that directly or indirectly names, advertises, or calls attention to a product, service, sale or sales event or other commercial activity." Sign code § 7.03.00.

73. Under section 7.27.00(g), any individual or business in the Town—including Plaintiffs—can display an inflatable that the Town considers to represent a "creative idea," but only if the Town does not think the inflatable's subject matter conveys a "commercial message."

74. Under this exemption, for instance, Plaintiffs could display a unicorn in front of Gone Broke Gaming. That is because unicorns are a "creative idea" and an inflatable unicorn in front of Gone Broke Gaming would not "directly or indirectly name[], advertise[], or call[] attention to a product, service, sale or sales event or other commercial activity" of Gone Broke Gaming.

75. In addition, any business that is not selling Mario-related products is free to erect an outdoor display of an inflatable Mario—the identical Mario that Plaintiffs wish to display—as the Town believes that such a display would not convey a commercial message.

76. In fact, as discussed below, Town Attorney Sam Garrison publicly stated that a person could display the inflatable Mario in his front yard, as Mario's placement in a residential neighborhood would not convey a commercial message.

77. The only reason Plaintiffs are not allowed to display the inflatable Mario in front of Gone Broke Gaming under section 7.27.00(g) is because the Town considers Mario's message to be a "commercial message" when placed near the store, since Gone Broke Gaming sells Mario-related products.

**A Town Hearing Confirms That the Inflatable Mario Violates the Sign Code.**

78. Because the Town's sign code permits other inflatables, and Scott had previously seen such inflatables throughout the Town, Plaintiffs contested that their inflatable Mario violated the sign code.

79. As a result, the Town held a code enforcement hearing on this issue on September 15, 2016. The hearing was presided over by the Town's Code Enforcement Special Magistrate, and the Town was represented by Town Attorney Sam Garrison.

80. The sole issue at the hearing was whether Plaintiffs' inflatable Mario, when displayed in front of Gone Broke Gaming, was a prohibited portable sign under sign code sections 7.05.00(f) (prohibiting portable signs) and 7.03.00 (defining portable signs).

81. A publicly available recording of this hearing [hereinafter "Town Hearing"] is available on the Town's website at http://www.townoforangepark.com/wp-content/uploads/2016/11/Code-Enforcement-091516.mp3.

82. During this hearing, Scott argued that his inflatable Mario should not be considered a portable sign under the Town's sign code because the Town did not consider the other inflatable displays he had seen to be portable signs. Town Hearing at 23:03–23:24.

83. Mr. Garrison responded by referencing the exemptions to the ban on portable signs contained in sections 7.27.00(g) and 7.27.00(q) of the sign code. Town Hearing at 23:43–24:10.

84. With respect to the Town's exemption for holiday and seasonal decorations, Mr. Garrison stated that "if someone puts up an inflatable Santa on their roof during Christmas time . . . that does not meet the definition of a portable sign under our town code." Town Hearing at 23:49–23:57.

85. Likewise, with respect to the artwork exemption, Mr. Garrison stated that "[i]f you put a Mario in your front yard, by all means, you are welcome to do it, you will never hear a word . . . from our code enforcement officer. You have the ability to do that under our code." Town Hearing at 23:59–24:09.

86. In contrast, Mr. Garrison stated that when the inflatable Mario was placed in front of Gone Broke Gaming, it was a prohibited portable sign because it communicated a "commercial message," since Gone Broke Gaming is a video-game store that sells Mario-related products. Town Hearing at 24:35–24:51.

87. The fact that Mario is a video-game character and the fact that Gone Broke Gaming is a video-game store were the only reasons the Town stated for why it issued a notice of violation for the inflatable Mario. Town Hearing at 5:43–6:05; 23:43–26:06.

88. Indeed, Town Enforcement Officer Gary Cooper—the officer who had given Plaintiffs the notice of violation—testified that the inflatable Mario posed no "safety hazard in any way for any citizens of Orange Park." Town Hearing at 30:34–30:40.

89. At the end of the hearing, the Code Enforcement Special Magistrate concluded that the inflatable Mario was a prohibited portable sign under section 7.05.00(f) of the sign code, and ordered Scott to remove Mario. Town Hearing at 31:40–32:35.

90. The Magistrate further stated that the penalty for not removing Mario would be a $100 fine, per day. Town Hearing at 33:37–33:45.

91. As a result of the threatened daily fines, Scott stopped displaying the inflatable Mario.

**The Town Has Injured Plaintiffs and Continues To Do So**

92. Both the Town's sign code and the Town's interpretation and enforcement of that code have violated Scott and Gone Broke Gaming's right to free speech as guaranteed by the First Amendment to the United States Constitution.

93. Plaintiffs wish to display their inflatable Mario in front of Gone Broke Gaming.

94. Because of the Town's enforcement of its sign code against Scott and Gone Broke Gaming, Plaintiffs have stopped displaying the inflatable Mario.

95. Due to Plaintiffs' inability to display their inflatable Mario, they have observed a significant decline in walk-in customers.

96. But for the fear of enforcement of the sign code, Plaintiffs would resume displaying their inflatable Mario every day in front of Gone Broke Gaming during their business hours.

97. Plaintiffs would be able to display an inflatable in front of Gone Broke Gaming pursuant to the Town's sign code if it expressed different content.

98. Plaintiffs would also be able to display an inflatable Mario in front of Gone Broke Gaming pursuant to the Town's sign code if Plaintiffs' business was not a video-game store or did not otherwise sell Mario products.

## CLAIMS FOR RELIEF

### Count I: Freedom of Speech

99. Plaintiffs incorporate and re-allege each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

100. Count One is brought pursuant to the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

101. The Free Speech Clause of the First Amendment protects the right of individuals and businesses to express themselves through the use of portable signs, including inflatable displays.

102. Plaintiffs' inflatable Mario is speech that is protected by the Free Speech Clause.

103. Plaintiffs wish to display their inflatable Mario in front of Gone Broke Gaming.

104. The Town of Orange Park's sign code, however, bans almost all portable signs, including inflatable displays. Sign code §§ 7.05.00(f), 7.03.00 (defining portable signs, which include inflatable displays).

105. This ban includes Plaintiffs' inflatable Mario when it is placed in front of Plaintiffs' store, Gone Broke Gaming.

106. Because of the Town's enforcement of its sign code against Plaintiffs, Plaintiffs stopped displaying the inflatable Mario.

**The Sign Code Is Unconstitutionally Content Based**

107. The ban on portable signs by the Town of Orange Park's sign code, both as applied to the Plaintiffs' inflatable Mario and on its face, is an unconstitutional content-based restriction on speech.

108. The Town exempts from its ban on portable signs inflatable displays that the Town decides qualify for the exemptions contained in sign code sections 7.27.00(g) (artwork) and 7.27.00(q) (holiday and seasonal decorations).

109. Inflatable displays that the Town decides qualify for the exemptions contained in sign code sections 7.27.00(g) and 7.27.00(q) are also exempt from the sign code's permit and fee requirements. Sign code §§ 7.12.00(a), (c).

110. The sign code defines "[a]rtwork" as "a two-or three-dimensional representation of a creative idea that is expressed in a form and manner as to provide aesthetic enjoyment for the viewer rather than to specifically convey the name of the business or a commercial message about the products or services offered on the property upon which the artwork is displayed." Sign code § 7.03.00 (definition section).

111. The sign code defines "[h]oliday and seasonal decorations" as "decorations that pertain to legal or other recognized holidays or to a season of the year." Sign code § 7.03.00 (definition section).

112. Accordingly, Plaintiffs could display a cold-air inflatable in front of Gone Broke Gaming or elsewhere if the Town viewed that inflatable's subject matter as qualifying for the exemptions contained in sign code sections 7.27.00(g) or 7.27.00(q).

113. In addition, Plaintiffs could display a cold-air inflatable without obtaining a sign permit or paying any permit fee provided that the Town viewed that inflatable's subject matter as qualifying for the exemptions contained in sign code sections 7.27.00(g) or 7.27.00(q).

114. Whether an inflatable display qualifies for the exemptions contained in sign code sections 7.27.00(g) or 7.27.00(q) turns on the content of that inflatable display.

115. Imposing different burdens on speech depending on its subject matter or message is a content-based restriction on free speech.

116. Content-based restrictions on speech are subject to strict scrutiny. In order to survive this scrutiny, the Town must show that its content-based restriction is narrowly tailored to further a compelling government interest.

117. The Town cannot meet this burden.

118. Upon information and belief, the Town has no evidence that the ban on portable signs, as applied to the Plaintiffs' inflatable Mario, is narrowly tailored to further a compelling government interest.

119. Upon information and belief, the Town also has no evidence that the ban on portable signs, on its face, is narrowly tailored to further a compelling government interest.

120. Thus, the ban on portable signs contained in sign code section 7.05.00(f), both as applied to the Plaintiffs' inflatable Mario, and on its face, is an unconstitutional content-based restriction on speech under the First Amendment.

**The Sign Code Is Unconstitutionally Speaker Based**

121. The ban on portable signs, both as applied to the Plaintiffs' inflatable Mario and on its face, is an unconstitutional speaker-based restriction on speech.

122. The Town exempts from its ban of portable signs inflatable displays that the Town considers to be "[a]rtwork." Sign code § 7.27.00(g).

123. The sign code defines "artwork" as "a two-or three-dimensional representation of a creative idea that is expressed in a form and manner as to provide aesthetic enjoyment for the viewer rather than to specifically convey the name of the business or a commercial message about the products or services offered on the property upon which the artwork is displayed." Sign code § 7.03.00 (definition section).

124. The inflatable Mario is "a two-or three-dimensional representation of a creative idea." *See* sign code § 7.03.00 (definition section).

125. The Town, however, views the inflatable Mario, when placed in front of a business selling Mario-related products, as conveying a "[c]ommercial message." *See* sign code § 7.03.00 (definition section).

126. Thus, the Town prohibits Plaintiffs from displaying the inflatable Mario in front of Gone Broke Gaming because Gone Broke Gaming is a video-game store that sells Mario-related video games.

127. In contrast, pursuant to sign code section 7.27.00(g), any individual or business could display an inflatable Mario, as long as the individual or business is not selling Mario-related products at the location where Mario would be displayed.

128. These individuals and businesses could display an inflatable Mario without obtaining a sign permit or paying any permit fee.

129. Thus, whether an inflatable display qualifies for the exemption contained in sign code section 7.27.00(g) turns on the speaker displaying that inflatable display.

130. Imposing different burdens on speech depending on the identity of the speaker is a speaker-based restriction on free speech.

131. Speaker-based restrictions on speech are subject to strict scrutiny. The government thus must show that the speaker-based restriction is narrowly tailored to further a compelling government interest.

132. The Town cannot meet this burden.

133. Upon information and belief, the Town has no evidence that the ban on portable signs, as applied to the Plaintiffs' inflatable Mario, is narrowly tailored to further a compelling government interest.

134. Upon information and belief, the Town also has no evidence that the ban on portable signs, on its face, is narrowly tailored to further a compelling government interest.

135. Thus the ban on portable signs, both as applied to the Plaintiffs' inflatable Mario and on its face, is an unconstitutional speaker-based restriction on speech under the First Amendment.

**Even if the Sign Code is Content- and Speaker-Neutral, It Is Still Unconstitutional**

136. Even if the Town's prohibition on portable signs under sign code section 7.05.00(f) is not content-based or speaker-based, it still violates the First Amendment, both as applied to Plaintiffs' inflatable Mario and on its face.

137. The Town does not have sufficient justification for either its ban on Plaintiffs' inflatable Mario specifically, or portable signs generally.

138. Plaintiffs' inflatable Mario is not false or misleading speech.

139. Neither the Town's ban on Plaintiffs' inflatable Mario specifically, nor portable signs generally, directly advances a substantial, important, or compelling government interest.

140. Upon information and belief, the Town possesses no evidence that either its ban on Plaintiffs' inflatable Mario specifically, or portable signs generally, directly advances any substantial, important, or compelling government interest.

141. In fact, Town Enforcement Officer Gary Cooper testified that Plaintiffs' inflatable Mario never posed a safety hazard.

142. Both the ban on Plaintiffs' inflatable Mario specifically, and portable signs generally, is more extensive than necessary to serve any substantial, important, or compelling government interest.

143. Thus the ban on portable signs, both as applied to Plaintiffs' inflatable Mario and on its face, is an unconstitutional restriction of speech under the First Amendment.

***

144. The Town's violation of Plaintiffs' free-speech rights causes Plaintiffs irreparable harm. Plaintiffs have no adequate remedy at law for this violation of their constitutional rights.

145. Unless Defendant is enjoined from committing the above-described constitutional violations of the First Amendment to the United States Constitution, Plaintiffs will continue to suffer great and irreparable harm.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. An entry of judgment declaring that the Town of Orange Park's sign code section 7.05.00(f) is unconstitutional both as applied to Plaintiffs' inflatable Mario display and on its face;

B. A preliminary injunction prohibiting Defendant from enforcing its sign code against Plaintiffs' inflatable Mario when it is placed in front of Gone Broke Gaming specifically, or from enforcing section 7.05.00(f) generally;

C. A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their inflatable Mario in front of Gone Broke Gaming specifically, or from enforcing section 7.05.00(f) generally;

D. An award of nominal damages in the amount of $1.00 for the violation of Plaintiffs' constitutional rights;

E. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

F. All further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED on April 6, 2017.

Justin M. Pearson*
Florida Bar No. 597791
Institute for Justice
2 South Biscayne Boulevard, Suite 3180,
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
Email: jpearson@ij.org

*Trial Counsel

Erica J. Smith**
Robert Frommer**
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: esmith@ij.org, rfrommer@ij.org

***Pro hac vice applications to be submitted*